# EXHIBIT A

## Summit County Clerk of Courts

AMERICAN SECURITY & AUDIO VIDEO SYSTEMS VS PREP TMT, LLC

| Case Number: | File Date: | Case Type: | Judge: |
|---|---|---|---|
| CV-2022-07-2227 | 07/01/2022 | BREACH OF CONTRACT | SUSAN BAKER ROSS |

| Filing Date | By Attorney | Docket Text | Document |
|---|---|---|---|
| 07/20/2022 | SUMMIT COUNTY CLERK OF COURTS | Certified Mail Service - Served THOMAS REED | No Image |
| 07/20/2022 | SUMMIT COUNTY CLERK OF COURTS | Certified Mail Service - Served PREP TMT, LLC | No Image |
| 07/20/2022 | SUMMIT COUNTY CLERK OF COURTS | Certified Mail Service - Served MATTHEW PROST | No Image |
| 07/01/2022 | AMERICAN SECURITY & AUDIO VIDEO SYSTEMS | SUMMONS ISSUED BY CERTIFIED MAIL BY Certified Mail REED, THOMAS | View Document |
| 07/01/2022 | AMERICAN SECURITY & AUDIO VIDEO SYSTEMS | SUMMONS ISSUED BY CERTIFIED MAIL BY Certified Mail PREP TMT, LLC | View Document |
| 07/01/2022 | AMERICAN SECURITY & AUDIO VIDEO SYSTEMS | SUMMONS ISSUED BY CERTIFIED MAIL BY Certified Mail PROST, MATTHEW | View Document |
| 07/01/2022 | CONGENI, CHRISTOPHER | CIVIL COMPLAINT FILED | View Document |
| 07/01/2022 | CONGENI, CHRISTOPHER | INSTRUCTIONS TO CLERK FOR SERVICE | View Document |

## IN THE COURT OF COMMON PLEAS
## SUMMIT COUNTY, OHIO

| | |
|---|---|
| AMERICAN SECURITY & <br> AUDIO VIDEO SYSTEMS, INC. <br> 10000 Aurora Hudson Rd. <br> Hudson, OH 44236 <br><br> FRANK BAXTER <br> 10000 Aurora Hudson Rd. <br> Hudson, OH 44236 <br><br> *Plaintiffs,* <br> vs. <br><br> PREP TMT, LLC <br> d/b/a PREP SECURITY <br> 7701 Clayton Rd. <br> St. Louis, MO 63117 <br><br> THOMAS REED <br> c/o Prep TMT, LLC <br> 7701 Clayton Rd. <br> St. Louis, MO 63117 <br><br> MATTHEW PROST <br> c/o Prep TMT, LLC <br> 7701 Clayton Rd. <br> St. Louis, MO 63117 <br><br> *Defendants.* | Civil Action No. _____ <br><br> Judge: _____ <br><br> **COMPLAINT** <br><br> Jury Demand Endorsed Hereon |

For their Complaint against Defendants Prep TMT, LLC d/b/a Prep Security ("Prep"), Thomas Reed ("Reed"), and Matthew Prost ("Prost"), Plaintiffs American Security & Audio Video Systems, Inc. ("ASAV") and Frank Baxter ("Baxter") state as follows:

### INTRODUCTION

1.     In August 2020, Reed, who had recently taken over as the owner of Prep, began actively working to make Prep a premier technology company and to increase Prep's dominance in the Missouri security and technology market, as reflected on Prep's website.

CV-2022-07-2227          BAKER ROSS, SUSAN          07/01/2022 12:36:07 PM          CMCO          Page 2 of 25

2.      To boost Prep's position in the technology market, Reed and Prost began to explore relationships with established companies, like ASAV in Ohio, who could provide Prep with access to industry expertise and exposure to local customers with whom ASAV had already fostered a business relationship. Performing work under ASAV's name would also provide Prep with a chance to boost Prep's standing in the market due to the goodwill and reputation that ASAV had spent years of resources developing.

3.      In July 2021, ASAV, through Baxter, its president, hired Prep to perform work on ASAV's behalf at Bloom Medicinals ("Bloom") facilities located throughout Missouri, including without limitation in O'Fallon, Missouri, and Cape Girardeau, Missouri.

4.      Aware that ASAV would provide access to ASAV's confidential, trade-secret information to Prep as necessary to complete work relating to the Bloom facilities, ASAV required Prep and its employees, agents, and representatives, including Reed and Prost, to safeguard the secrecy and sensitive nature of ASAV's operations, customers, marketing policies, installation policies, and monitoring or servicing policies.

5.      Before providing access to ASAV's confidential, trade-secret information, ASAV also required Prep and its employees, agents, and representatives, including Reed and Prost, not to attempt to sell products or provide services like those sold or provided by ASAV to any of ASAV's customers or subscribers for a period of thirty-six months.

6.      Despite that Defendants expressly agreed to limit its access to and use of Plaintiffs' confidential, trade-secret information under these conditions, Prep, under the leadership of Reed and Prost, nonetheless sought to accomplish Prep's goal of becoming a premier technology company by abusing its access to ASAV's trade secrets.

2

7.      Accordingly, Defendants are liable to ASAV and Baxter for breaching the express contractual obligations Defendants agreed to be bound by before gaining access to ASAV's trade secrets in the first place and then tortiously interfering in ASAV's contractual and business relationships in the process.

## THE PARTIES

8.      ASAV is an Ohio corporation based in Hudson, Summit County, Ohio. ASAV transacts business in multiple states, including Ohio, Pennsylvania, Michigan, New Jersey, Colorado, Indiana, Arkansas, and Missouri.

9.      Baxter is a natural person and the president of ASAV. Baxter is a citizen and domiciliary of the State of Ohio.

10.     Prep is a limited liability company organized under the laws of the State of Missouri with its principal place of business in Saint Charles, Missouri.

11.     Reed is a natural person who, upon information and belief, is a citizen and domiciliary of the State of Missouri. At all times relevant, Reed was the owner of Prep.

12.     Prost is a natural person who, upon information and belief, is a citizen and domiciliary of the State of Missouri. At all times relevant, Prost was the general manager of Prep.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this Complaint under R.C. 2305.01 because the amount in controversy exceeds $25,000.

14.     This Court has personal jurisdiction over Defendants pursuant to R.C. 2307.382(A)(4) because Defendants caused tortious injury to Plaintiffs by acts outside of Ohio committed with the purpose of injuring ASAV in Ohio, when Defendants might reasonably have expected that ASAV would be injured in Ohio.

3

15.     This Court's exercise of personal jurisdiction over Defendants otherwise comports with traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court under Civ.R. 3(C)(6) because Plaintiffs suffered claims for relief arose in this County, or alternatively, under Civ.R. 3(C)(12), because Plaintiffs reside in and regularly conduct business in this County.

## FACTUAL ALLEGATIONS

**A.      ASAV has spent substantial time, resources, and expertise in developing its proprietary security systems, as well as developing processes, techniques, and methods in installing such systems.**

17.     ASAV is engaged in the business of manufacturing, fabricating, merchandising, selling, distributing, installing, servicing, repairing, and monitoring electronic systems, including burglary, fire and intrusion protective and detection systems and devices, emergency notification systems, video surveillance systems, closed circuit and television systems, communication systems, central cleaning systems, access systems, various sound systems, home theatre and audio/video systems, for residential, commercial, industrial, and governmental applications.

18.     ASAV provides, among other things, integrated electronic security systems for residential homes, commercial businesses, and government properties.

19.     ASAV has spent years developing and refining its methods, techniques, formulas, designs, and processes relating to the installation of ASAV's security systems. Those methods, techniques, formulas, designs, and processes include proprietary information about how ASAV's engineer designed ASAV's systems, the pieces of hardware that make up ASAV's systems, and special notes about the requirements for ASAV's systems.

20.     The successful installation of ASAV's systems requires two key categories of proprietary information and materials.

4

21.     The first category of proprietary information includes the job ticket. For each installation, ASAV creates a job ticket that instructs the installer about the specific design of the system and the parts needed to successfully implement the system. As such, each job ticket contains confidential and secret information about ASAV's methods, techniques, formulas, designs, and processes.

22.     The second category of proprietary information includes ASAV's programming information and related training, which instructs the installer on how to properly connect all parts and hardware and how to make ASAV's designed systems function properly.

23.     Without either category of ASAV's proprietary information, the installer cannot complete the installation of ASAV's systems because the installer would be unable to make ASAV's proprietary systems function properly.

24.     ASAV requires all persons and entities it hires as subcontractors to agree to strictly protect and safeguard ASAV's proprietary materials and intellectual property, including but not limited to those described herein.

**B.      Before hiring Prep, ASAV had an established relationship with Bloom Medicinals.**

25.     One of ASAV's customers is Bloom Medicinals ("Bloom"), a company with medical marijuana dispensaries located nationwide, including in Arkansas, Florida, Illinois, Maryland, Missouri, New Jersey, and Ohio.

26.     In Bloom's Missouri operations, Bloom has facilities located in Cape Girardeau, O'Fallon, Springfield, and Cameron.

27.     In 2021, Bloom hired ASAV to install ASAV's proprietary systems at two of Bloom's Missouri facilities, one located in O'Fallon Missouri (the "O'Fallon Project"), and another located in Cape Girardeau, Missouri (the "Cape Girardeau Project") (collectively, the "Projects").

5

28.      Though ASAV was presently working on the Projects, ASAV's business relationship with Bloom was not limited to those Projects. ASAV and Bloom had an ongoing business relationship such that Bloom and ASAV repeatedly communicated about future projects.

29.      Since August 10, 2020, ASAV has performed work for Bloom at multiple facilities in Ohio, Missouri, and Arkansas.

30.      Around the same time that Bloom hired ASAV for the Projects, Bloom's representatives expressed that Bloom planned to use ASAV to perform additional work at its other Missouri facilities, including a cultivation facility and dispensary in Cameron, Missouri (the "Cameron Projects") and a dispensary in Springfield, Missouri (the "Springfield Project").

**C.      In July 2021, ASAV hired Prep to perform work for ASAV under the express conditions that Prep would safeguard ASAV's trade-secret information and refrain from servicing ASAV's customers.**

31.      Prior to ASAV hiring Prep for the O'Fallon and Cape Girardeau Projects, Prep reached into Ohio to solicit ASAV's business and to build a working relationship with ASAV through which ASAV would funnel jobs to Prep in Missouri and elsewhere.

32.      In June and July 2021, ASAV Prep as a subcontractor to assist ASAV with the O'Fallon Project and Cape Girardeau Project.

33.      Prep is engaged in the business of installing pre-designed electronic systems, including burglar and fire alarm systems, access control systems, video surveillance systems, and closed-circuit television systems.

34.      While Prep had some previous experience in security work before ASAV hired them, Prep did not have any experience in installing or working with ASAV's equipment.

35.      ASAV required Prep and its employees, agents, and representatives to agree to be bound by certain terms and conditions to protect the confidentiality of ASAV's sensitive and proprietary information to which Prep would receive access to complete the Projects.

6

36.     On July 1, 2021, Prep's general manager, Prost, signed a subcontractor agreement to perform work on ASAV's behalf regarding the O'Fallon Project (the "O'Fallon Agreement").  A true and accurate copy of the O'Fallon Agreement is attached hereto as **Exhibit A**.

37.     On July 16, 2021, Prep's president, Reed signed a subcontractor agreement to perform work on ASAV's behalf regarding the Cape Girardeau Project (the "Cape Girardeau Agreement"). A true and accurate copy of the Cape Girardeau Agreement is attached here to as **Exhibit B.**

38.     In both the O'Fallon Agreement and the Cape Girardeau Agreements (collectively, the "Agreements"), Prep expressly agreed "not to divulge any information about [ASAV], its operations, customers, marketing policies, installation policies, monitoring or servicing policies."

39.     Through this provision, Defendants acknowledged the confidential, sensitive, and proprietary nature of ASAV's information, to which Defendants would receive access as necessary to perform work in connection with ASAV's name and reputation up to ASAV's standards.

40.     In the Agreements, Prep expressly agreed that the Agreements "shall be construed in accordance with the laws of the State of Ohio."

41.     In the Agreements, Prep expressly agreed that

> upon termination of this Agreement neither he nor his employee's agents, or officers … will in any way contact, solicit or attempt to sell similar products or services of [ASAV] to any of [ASAV]'s customers and/or subscribers regardless of the customer/subscriber's geographical location for a period of thirty six (36) months from the date of termination of this Agreement, either for his own benefit or the benefit of any other person, firm, partnership or corporation.

42.     In the Agreements, Prep expressly agreed that upon termination of the Agreements, Prep would immediately "return to [ASAV] all equipment, supplies, and all other property of [ASAV] in the possession of [Prep] and shall return to [ASAV] all paperwork, work orders and other documents relating to [ASAV]'s installation(s)."

7

43. Pursuant to the terms and conditions of the Agreements, ASAV provided Prep and its employees, agents, and representatives, with access to ASAV's confidential information for the sole purpose of enabling Prep to assist ASAV with installation and labor on various jobs, including the O'Fallon Project and the Cape Girardeau Project.

44. With knowledge that Prep agreed in the Agreements to safeguard and preserve the secrecy of ASAV's confidential, trade-secret information and promised not to steal ASAV's customers, ASAV requested that Prep provide quotes for other upcoming projects, including without limitation a Bloom cultivation facility (the "Cameron Cultivation Project") and dispensary facility (the "Cameron Dispensary Project") located in Cameron, Missouri, as well as a facility located in Springfield, Missouri (the "Springfield Project").

45. In July 2021, Prep quoted the Cameron and Springfield Projects. *Id.*

46. After Prep agreed to the terms and conditions of the Agreements, ASAV provided Prep with direct access to ASAV's customer contacts at Bloom.

**E.      Soon after entering into the Agreements, ASAV became concerned with Prep's ability to adequately perform the O'Fallon and Cape Girardeau Projects.**

47. Before sending Prep any of ASAV's job materials, equipment, or information, ASAV's installation manager, Greg Carver ("Carver") labelled all such materials and equipment to assist Prep in the installation process.

48. On July 7, 2021, ASAV emailed Prost asking for a status update on the O'Fallon Project (the "7.7 Email").

49. In response to the 7.7 Email, Prost began asking for ASAV's help and guidance on how to complete the installation based on the proprietary blueprints, wiring schematics, programming information, and job-ticket information ASAV sent to Prep.

8

50.     Carver advised Prost not to "daisy chain the panics" and began asking why Prep was "hard wiring panic buttons[.]"

51.     ASAV began to grow concerned that Prep would not be able to perform the Projects in a timely fashion, let alone in a manner that would deliver the quality of work ASAV promised to Bloom.

52.     On July 9, 2021, Reed called ASAV with questions about the Cameron Projects. During the call, Reed steered the conversation from the Cameron Projects and began probing ASAV for information about the other work that ASAV performed outside of Ohio. Based on Reed's questions and the tenor of his comments during this call, ASAV understood that Prep wanted to expand its operations by whatever means necessary.

53.     By August 2021, Chris Diaz, ASAV's commercial estimator and system designer ("Diaz"), continued to worry that Prep would not be able to complete the Projects because Prep's performance on the Projects had still not improved.

54.     Because of the ongoing issues ASAV was having with Prep's performance, Diaz began attempting to contact Prost, but Prost was not responsive to Diaz's communications.

55.     On August 17, 2021, ASAV emailed Prost, Prep's manager, regarding issues on the Projects (the "8.17 Email").

56.     ASAV sent the 8.17 Email because Bloom was becoming concerned about the status of the O'Fallon and Cape Girardeau Projects.

57.     Hearing Bloom's concerns, ASAV made multiple attempts to discuss these issues with Prep, including several phone calls and emails. But Prep did not respond to ASAV's communications.

9

58.    As of late September 2021, ASAV had great concerns about Prep being able to have the Projects completed in time.

59.    On September 21 and October 6, 2021, respectively, ASAV provided Prep with additional proprietary information to use in connection with the Projects.

60.    Based on Prep's lack of communication and the issues with Prep's performance on the Projects, it was becoming clear that Prep needed further assistance from ASAV to complete the Projects.

61.    Due to Prep's lack of experience and Prep's difficulties in completing the Projects, in September and October 2021, Carver travelled to Missouri for the purpose of training Prep and its employees in connection with the Projects.

62.    Carver provided on-site training to Prep regarding the O'Fallon Project on September 28, September 29, and September 30, 2021.

63.    Carver provided on-site training to Prep regarding the Cape Girardeau Project on October 12, October 13, and October 14, 2021.

64.    The training ASAV provides to subcontractors through Carver is proprietary because it involves in-depth discussion of ASAV's proprietary systems, step-by-step guidance in how such systems are to be built and assembled, and what must be done to ensure that such systems function properly.

65.    Without the training provided by ASAV, a subcontractor like Prep who does not possess experience in working with ASAV's systems, would not be able to properly install ASAV's systems.

10

66.    On November 12, 2021, Diaz emailed Prost that it was "imperative" for Prep's technicians to be on site at the Cape Girardeau and O'Fallon locations "to get things up and running" when Carver would be available to provide, by phone, Prep's technicians with explicit guidance.

67.    On December 17, 2021, Diaz had to once again email Prep regarding Prep's substandard performance on the Projects.

68.    On December 17, 2021, Diaz informed Prep that Bloom was still "having issues" with the work performed in connection with the Projects, and that, based on Diaz's assessment, the issues were caused by Prep's defective work, rather than by ASAV's proprietary programming.

69.    ASAV had to spend substantially more time working with Prep on the Projects compared to the amount of time that ASAV typically spends assisting companies that ASAV hires in similar subcontractor arrangements.

70.    Based on Prep's difficulties in completing the Projects and the need for substantial additional training, it was apparent to ASAV that Prep had little to no experience in installing or working with systems like ASAV's.

**F.    Upon discovering that Prep was actively seeking to misuse ASAV's trade-secret information to steal Bloom as a customer, ASAV terminated the Agreements and demanded that Prep return all of ASAV's information and property.**

71.    In or around March 2022, ASAV become aware that Prep was performing covert work, outside of the Subcontractor Agreements, for Bloom regarding the O'Fallon and Cape Girardeau Projects and potentially other Bloom projects.

72.    Due to discovering Prep's misconduct, Baxter arranged a conference call with Prep, Reed, and Prost.

73.    The conference call occurred on March 4, 2022 (the "Conference Call").

11

74.     During the Conference Call, Baxter confronted Reed and Prost with the newly discovered information that Prep was abusing its access to ASAV's confidential and trade-secret information to steal Bloom out from under ASAV.

75.     During the Conference Call, neither Reed nor Prost denied that Prep had spoken to Bloom about performing work for Bloom that ASAV had previously agreed to perform.

76.     During the Conference Call, neither Reed nor Prost denied that Prep had used ASAV's confidential and trade-secret information.

77.     During the Conference Call, neither Reed nor Prost denied that Prep intended to continue attempting to provide products or services like ASAV's to Bloom.

78.     During the Conference Call, Baxter notified Prep that ASAV intended to terminate the Subcontractor Agreements and demanded that Prep return ASAV's proprietary information and materials.

79.     Following the Conference Call, on March 7, 2022, ASAV exercised its right to terminate the Agreements by providing written notice to Prep of such termination (the "Termination Notice").

80.     In terminating the Agreements, Baxter and ASAV determined that Prep's performance to date was both defective and unsatisfactory under Sections 10 and 12 of the Agreements due to Prep exploiting its relationship with ASAV to steal Bloom, in addition to the problems and issues ASAV experienced with Prep's work prior to learning about Prep's misconduct.

81.     ASAV has never had a subcontractor turn out to be so incapable of performing the work that ASAV hired the subcontractor to perform, as ASAV experienced with Prep regarding the Bloom Projects.

12

82.     ASAV has never had a subcontractor provide or attempt to provide services to one of ASAV's customers or subscribers, as Prep has done with ASAV's customers, including Bloom.

83.     ASAV has never experienced a dispute with a subcontractor about whether ASAV's agreements prohibited the subcontractor from providing or attempting to provide services to ASAV's customers, whether the customer contacted the subcontractor or whether the subcontractor contacted the customer.

84.     To the contrary, every other subcontractor ASAV has hired to perform work on ASAV's behalf understood, based on ASAV's subcontractor agreement, that ASAV would not provide access to ASAV's proprietary and confidential materials and information without an agreement that the subcontractor would not provide services to ASAV's customers outside of the relevant subcontractor agreement.

85.     In the Termination Notice, Baxter also expressly requested a list from Prep regarding the work that Prep failed to complete on the O'Fallon and Cape Girardeau Projects.

86.     To date, Prep has refused and failed to return ASAV's confidential and proprietary information and property, including unused job materials, programming information, job tickets, blueprints, and other sensitive documents.

87.     ASAV only permitted Defendants to access ASAV's customer relationships and ASAV's confidential, trade-secret information under the express understanding that such access would be strictly limited to completing the work ASAV hired Prep to perform on ASAV's behalf.

88.     Defendants have, through the conduct alleged herein, irreparably damaged Plaintiffs' relationship with Bloom, as well as Plaintiffs' business operations in Ohio, including the loss of customers and the loss of revenues generated from customer accounts. Furthermore, due to Defendants' conduct, other subcontractors, including those located in Ohio, will be induced to

13

enter into contracts with ASAV only to exploit access to ASAV's trade secrets to gain a competitive advantage over ASAV.

89.      Defendants' conduct was and is in furtherance of a scheme to obtain and convert for their personal use and gain ASAV's confidential information to steal ASAV's customers, to convert the goodwill generated, directly or indirectly, by Defendants' association with ASAV, to interfere in ASAV's established and prospective contractual and business relationships, and to eliminate ASAV from ASAV's established and prospective contractual and business relationships.

90.      Defendants have already used and have made clear that Defendants intend to continue using ASAV's information and the benefit of ASAV's expertise and experience to solicit ASAV's customers, including Bloom, and to divert the business of such customers from ASAV to Prep.

91.      Upon information and belief, Defendants have possession or control of extensive confidential information from ASAV, ASAV's proprietary information, and ASAV's trade secrets, including without limitation blueprints, programming information, job tickets, and training provided to Prep.

92.      Upon information and belief, Defendants have used and will continue to use this information to solicit ASAV's customer accounts and to divert the business of ASAV's customers, including without limitation Bloom, from ASAV to Defendants,

93.      ASAV has suffered substantial harm to its business in Ohio, including lost wages and reputational harm, because of Defendants' conduct.

94.      Baxter has suffered substantial harm in Ohio, including mental distress and reputational harm, because of Defendants' conduct

14

## COUNT 1
## BREACH OF CONTRACT
### (Plaintiffs vs. Prep)

95.     Plaintiffs incorporate the foregoing paragraphs as if fully rewritten here.

96.     By virtue of the Subcontractor Agreements, a contract existed between ASAV and Prep.

97.     Plaintiffs have performed all obligations that ASAV was required to perform in compliance with the terms and conditions set forth in the Subcontractor Agreements.

98.     Prep materially breached the Subcontractor Agreements by, among other things, misusing ASAV's confidential, trade-secret information; failing to return ASAV's property upon termination of the Subcontractor Agreements; attempting to provide ASAV-like services to ASAV's customers, including Bloom; and providing ASAV-like services to ASAV's customers, including Bloom.

99.     Because of Prep's material breaches of the Subcontractor Agreements, ASAV has been damaged in an amount to be proven at trial in excess of $25,000.

## COUNT 2
## TORTIOUS INTERFERENCE
## WITH CONTRACT
### (Plaintiffs vs. Prep, Reed, and Prost)

100.    Plaintiffs incorporate the foregoing paragraphs as if fully rewritten here.

101.    A contract existed between Plaintiffs and Bloom regarding work to be performed at various Bloom facilities, including without limitation the O'Fallon Project and the Cape Girardeau Project.

102.    Defendants knew that contracts existed between Plaintiffs and Bloom, including without limitation regarding the O'Fallon Project and the Cape Girardeau Project.

103.    Despite knowledge that contracts existed between Plaintiffs and Bloom, Defendants intentionally sought to procure a breach of the contract between Plaintiffs and Bloom so that

15

Defendants could cut Plaintiffs out of the contracts and take Bloom as a customer of their own and injure Plaintiffs in Ohio.

104.    Defendants sought to interfere in Plaintiffs' contractual relationship with Bloom for Defendants' own interests and financial gain, including to enhance Defendants' reputation and boost Defendants' position in the market.

105.    There was no justification for Defendants' conduct in interfering with and attempting to procure a breach of the contract between Plaintiffs and Bloom.

106.    Plaintiffs are entitled to punitive damages for the misconduct described herein, because Defendants acted with conscious disregard for Plaintiffs' rights with a great probability of causing substantial harm to Plaintiffs.

107.    Defendants engaged in the misconduct alleged herein to cause injury to Plaintiffs in Ohio and knew or might reasonably have expected that Plaintiffs would suffer injury in Ohio.

108.    As a direct and proximate result of Defendants' misconduct, Plaintiffs have suffered damages in an amount to be proven at trial, including without limitation lost profits, consequential losses, mental distress, and harm to Plaintiffs' professional reputation.

### COUNT 3
### TORTIOUS INTERFERENCE WITH
### BUSINESS RELATIONSHIP
### (Plaintiffs vs. Prep, Reed, and Prost)

109.    Plaintiffs incorporate the foregoing paragraphs as if fully rewritten here.

110.    An ongoing business relationship existed between Plaintiffs and Bloom.

111.    Defendants knew that an ongoing business relationship existed between Plaintiffs and Bloom.

112.    Defendants knew that an ongoing business relationship existed between Plaintiffs, on the one hand, and Bloom, on the other, because Plaintiffs requested that Defendants provide Plaintiffs

16

with quotes on upcoming Bloom projects, including without limitation the Cameron Cultivation Project, the Cameron Dispensary Project, and the Springfield Project.

113.    Despite knowledge of the ongoing business relationship between Plaintiffs, on the one hand, and Bloom, on the other, Defendants intentionally sought to interfere in that relationship to cut Plaintiffs out of the Bloom relationship and injure Plaintiffs in Ohio.

114.    Defendants sought to interfere in Plaintiffs' business relationship with Bloom for Defendants' own interests and financial gain, including to enhance Defendants' reputation and boost Defendants' position in the market.

115.    There was no justification for Defendants' misconduct in interfering with the ongoing business relationship between Plaintiffs on the one hand, and Bloom on the other.

116.    Plaintiffs are entitled to punitive damages for the misconduct described herein, because Defendants acted with conscious disregard for the rights of Plaintiffs with a great probability of causing Plaintiffs substantial harm.

117.    Defendants engaged in the misconduct alleged herein to cause injury to Plaintiffs in Ohio and knew or might reasonably have expected that Plaintiffs would suffer injury in Ohio.

118.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be proven at trial, including without limitation lost profits, consequential losses, emotional distress, and harm to Plaintiffs' reputations.

17

## COUNT 4
## CIVIL CONSPIRACY TO COMMIT
## TORTIOUS INTERFERENCE
### (Plaintiffs vs. Reed and Prost)

119.    Plaintiffs incorporate the foregoing paragraphs as if fully rewritten here.

120.    Reed and Prost entered into an agreement, plan, and scheme by which they sought to tortiously interfere with Plaintiffs' business relationship with Bloom.

121.    Reed and Prost acted in furtherance of their agreement, plan, and scheme to tortiously interfere with Plaintiffs' business relationship with Bloom by, among other things, covertly working for Bloom behind Plaintiffs' back and taking steps to steal Bloom as a customer for Prep.

122.    Reed and Prost both intended to cause a disruption in, breach, or termination of Plaintiffs' business relationship with Bloom.

123.    As a direct and proximate result of Reed and Prost's misconduct, Plaintiffs have suffered damages in an amount to be proven at trial, including without limitation lost profits, consequential losses, emotional distress, and harm to Plaintiffs' reputations.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs ASAV and Frank Baxter demand judgment against Defendants Prep, Reed, and Prost as follows:

1.    Entry of judgment on Plaintiffs' Complaint against Defendants Prep, Reed, and Prost;

2.    An award of compensatory damages against Defendants Prep, Reed, and Prost;

3.    An award of punitive damages against Defendants Prep, Reed, and Prost as allowed by law;

4.    An award of reasonable attorneys' fees and costs against Defendants Prep, Reed, and Prost, as allowed by law;

18

5. Pre-and post-judgment interest on all damages awarded against Defendants Prep, Reed, and Prost;

6. Any further relief that this Court deems just and proper and/or to which Plaintiffs may otherwise be entitled.

## JURY DEMAND

Plaintiffs ASAV and Baxter demand a trial by jury on all issues within this Complaint.

Respectfully submitted,

/s/ *Christopher B. Congeni*
Christopher B. Congeni (0078160)
Rachel L. Hazelet (0097855)
**MATASAR JACOBS LLC**
1111 Superior Avenue, Suite 1355
Cleveland, OH 44114
Phone: (216) 453-8180
Fax: (216) 282-8600
ccongeni@matasarjacobs.com
rhazelet@matasarjacobs.com

*Counsel for Plaintiffs American Security & Audio Video Systems, Inc., and Frank Baxter*

19

### *American Security & Audio Video Systems, Inc.*
10000 Aurora Hudson Road, Hudson, OH 44236 (330) 468-3366

## SUBCONTRACTOR AGREEMENT

THIS AGREEMENT made and entered into this 30th day of June 2021 by and between **American Security & Audio Video Systems, Inc.** (hereafter called *"COMPANY"*), whose address is 10000 Aurora Hudson Road, Hudson, OH 44236 and and (Company) Prep TMT, LLC, License# LC 001709938 (hereinafter called **"SUBCONTACTOR"**), whose address is 3010 N. Highway 94, Unit E, Saint Charles, MO, 63301 and telephone is (636) 493-0514, with regard to the following facts:

A.  *WHEREAS, the COMPANY is engaged in the business of manufacturing, fabricating, merchandising, selling, distributing, installing, servicing, repairing and monitoring electronic systems, including, BUT NOT LIMITED TO: burglary, fire and intrusion protective and detection systems and devices, emergency notification systems, closed circuit and television systems, communication systems, central cleaning systems, access systems, sound systems, stereo system, home theater systems; for residential, commercial, industrial and government applications presently in Ohio and expanding into other territories.*

B.  SUBCONTRACTOR is in the business of installing pre-designed electronic systems, including burglar and fire alarm systems, access control systems, and closed circuit television systems.

C.  The parties desire that SUBCONTRACTOR perform services for COMPANY as an independent contractor pursuant to the terms and conditions of this Agreement.

IT IS HEREBY AGREED AS FOLLOWS:

1.      SUBCONTRACTOR will furnish all of the labor, wire , cable supports and tools necessary to perform the work in accordance with the schedule set forth on the COMPANY work order, drawings and other documents provided by COMPANY to SUBCONTRACTOR. SUBCONTRACTOR shall be compensated for said work in accordance with the terms and conditions herein at the rate of **$16,925.00 (Quote #1841 $8,462.50 and #1842 $8,463.50). $8,462.50 invoiced upon completion of pre-wire, $8,462.50 invoiced upon completion of installation.**
Additional labor requested **$85.00** per hour standard technical installation/service personnel, if services are performed on an hourly basis, or the labor quote provided by SUBCONTRACTOR on a per job basis, or other compensations as determined by the COMPANY. If SUBCONTRACTOR performs hourly work for COMPANY, COMPANY at its sole discretion, shall verify both the accuracy of the amount of the hourly work being charged and the propriety and necessity of the work undertaken on an hourly basis.

2.      SUBCONTRACTOR shall pay all costs in connection with the labor and materials incurred by it in the installation of each system. In the event SUBCONTRACTOR fails to make any payment, to its laborer and/or material providers, COMPANY, at its sole discretion, may make such payments on behalf of the SUBCONTRACTOR and shall deduct the said amount from the funds due to the SUBCONTRACTOR. SUBCONTRACTOR shall in no way charge to or obligate COMPANY for any tools, materials or services.

3.      SUBCONTRACTOR shall install each installation in a good and workmanlike manner, and shall adhere to the standards and specifications required by COMPANY. COMPANY shall have the right to inspect each installation and, if such installation is not satisfactory, require the SUBCONTRACTOR to make any changes or additions deemed necessary by COMPANY, at its sole discretion.

4.      SUBCONTRACTOR shall be excused from any delay and completion of the work on any installation caused by acts of God, acts of COMPANY'S customer (hereinafter called "OWNER"), or the OWNER'S agents. Should the OWNER assess damages for delay, whether liquidated damages or otherwise, against COMPANY, because of any delay caused by SUBCONTRACTOR or SUBCONTRACTOR'S laborers or suppliers, then SUBCONTRACTOR shall reimburse COMPANY in full upon written demand by COMPANY. SUBCONTRACTOR shall commence work on any installation assigned to it by COMPANY as soon as possible, but no later than 3 days after written notification from COMPANY and will conduct the work continuously with reasonable diligence in strict accordance with COMPANY'S time schedule, and will conform with any change in the time schedule ordered by COMPANY, and cooperate in related work and in no manner will interfere with the work of COMPANY or other subcontractors.

5.      SUBCONTRACTOR shall comply with all terms and conditions of any collective bargaining agreement which COMPANY notifies SUBCONTRACTOR in writing is applicable to the work to be done under this Subcontract Agreement and prevent the

Initials:_____

Sub Agree 1-21

## EXHIBIT A

occurrence of any strikes, slow down or other labor difficulties or dispute arising out of the presence of SUBCONTRACTOR on the job or the activities of SUBCONTRACTOR.

6.      SUBCONTRACTOR will be solely responsible for any and all of its expenses, health and medical insurance and will maintain in full force and effect a Workman's Compensation insurance policy and comprehensive liability insurance policy and automobile liability policy each with a minimum limit of $1,000,000.00 or such other limit as specified by COMPANY in Appendix A for death or injury to any one person or injury or death to persons in any one accident and for damages to or destruction of property and the naming of COMPANY as an additional insured. Such policy shall not be cancelable without thirty (30) days prior written notice to COMPANY. SUBCONTRACTOR will furnish to COMPANY upon request a certificate of the insurance carrier showing current coverage and expiration dates. SUBCONTRACTOR agrees to hold COMPANY harmless and indemnify COMPANY from and against any and all loss, cost, expense, damage, suits, causes of action, attorney's fees and any and all other costs or expenses arising out of the action or inaction (including active or passive negligence) of SUBCONTRACTOR, its agents or employees, including without limitation any charge to OWNER or OWNER'S property, and Company's actual attorney's fees for above and for COMPANY's enforcement of the terms and conditions of this Agreement.

7.      It is hereby declared to be the express intention of each of the parties that the relationship created hereto between COMPANY and SUBCONTRACTOR by this Agreement is that of an independent contractor and SUBCONTRACTOR. SUBCONTRACTOR'S employees or agents shall not be deemed to be the employees or agents of COMPANY for any purpose. SUBCONTRACTOR shall have the sole right to hire and fire all of its employees or agents and shall exercise all control, direction and supervision over them with respect to the work to be performed hereunder, and the manner in which the work is to be performed, and COMPANY shall not have any right to exercise any control, direction or supervision over the said employees or agents of SUBCONTRACTOR, subject to the limitations set forth herein. SUBCONTRACTOR or its agents agree not to divulge any information about COMPANY, its operations, customers, marketing policies, installation policies, monitoring or servicing policies.

8.      SUBCONTRACTOR agrees that it shall make and shall be responsible for all required deductions for payments to its employees or agents and shall make and render in its own name all reports and payments of such sums so deducted as shall be required by any and all Federal and State Unemployment Compensations Acts, Social Security Act and any and all other Federal and/or State laws relating to taxes on income and by all other Federal or State laws of whatsoever kind and character.

9.      SUBCONTRACTOR will comply with all laws, ordinances, rules, regulations, orders and requirements of any public body and any building inspector and will maintain its contractor's license in effect as required in the State. SUBCONTRACTOR shall bear the entire expense of complying with all of the requirements of this paragraph and shall receive no extra or additional compensation thereof.

10.     This Agreement may be terminated by COMPANY at any time upon the giving of written notice to the SUBCONTRACTOR. If COMPANY shall terminate this Agreement SUBCONTRACTOR shall cease work immediately on any installations in progress, and shall return to COMPANY all equipment supplies, and all other property of COMPANY in the possession of SUBCONTRACTOR and shall return to COMPANY all paperwork, work orders and other documents relating to COMPANY'S installation(s). Upon the failure of the SUBCONTRACTOR to return all such property immediately upon termination of this Agreement, SUBCONTRACTOR irrevocably consents to and authorizes COMPANY to apply any and all funds under its control and payable to SUBCONTRACTOR to the costs, replacement or recovery of said property. Nothing contained in this provision shall be construed to limit COMPANY's rights to seek additional relief. Upon termination of this Agreement by COMPANY, COMPANY shall compensate SUBCONTRACTOR for work completed by SUBCONTRACTOR prior to termination of this Agreement based upon the percentage completion of the installation; provided, no payment shall be made to SUBCONTRACTOR until the work performed by SUBCONTRACTOR has been approved by COMPANY, and any payments made to SUBCONTRACTOR shall be subject to offset by COMPANY for any losses sustained by COMPANY as provided for in this Agreement, including any expenses incurred by COMPANY in having work performed by SUBCONTRACTOR reinstalled, restored, and/or corrected.

11.     As an inducement for COMPANY to enter into this Agreement with SUBCONTRACTOR, and as part of the consideration for entry into it, SUBCONTRACTOR agrees that upon the termination of this Agreement neither he nor his employee's, agents, or officers will induce or endeavor to induce, directly or indirectly, an employee or other agent of COMPANY to leave such employment or agency, or will in any way contact, solicit or attempt to sell similar products or services of the COMPANY to any of the COMPANY's customers and/or subscribers regardless of the customer/subscriber's geographical location for a period of thirty six (36) months from the date of termination of this Agreement, either for his own benefit or the benefit of any other person, firm, partnership or corporation. SUBCONTRACTOR will in no way represent that he is an employee of COMPANY nor shall he use the name of COMPANY or any names which may be associated with or confused with COMPANY.

12.    In the event the OWNER contends that the work of the SUBCONTRACTOR was defective or caused delays, or is unsatisfactory in some other way, and if as a result of the same OWNER fails to pay any amount which would have otherwise been due COMPANY, the amount of any losses sustained by COMPANY as a result shall be deducted from the payments to be made to SUBCONTRACTOR hereunder unless said claim asserted by OWNER was caused by COMPANY.

13.    SUBCONTRACTOR agrees to guarantee his work to COMPANY against all defects in workmanship and materials supplied by SUBCONTRACTOR for a period of ninety (90) days from the date of completion unless otherwise stated in Appendix or other documents provided by COMPANY relative to this Agreement.

14.    Each paragraph and provision of this Agreement is severable from the Agreement and if one provision or part thereof is declared invalid, the remaining provisions shall nevertheless remain in full force and effect. It is expressly agreed that this Agreement embodies the entire agreement of the parties in relation to the subject matter hereof and that no other agreement or understanding, verbal or otherwise, relative to the subject matter hereof exists between the parties at the time of execution hereof. This Agreement shall be construed in accordance with the laws of the State of Ohio. All appendices and attachments to this Agreement are incorporated by reference herein and made a part hereof. The waiver by either party of any condition, requirement or provision of this Agreement shall not be construed to be a subsequent or continuing waiver of such condition, requirement or provision. Terms and references to any gender refer to all genders.

IN WITNESS WHEREOF, the parties hereafter have executed this Agreement on the date first above written.

COMPANY

By: _____
        Frank Baxter-President

_7/2/2021_
Date

SUBCONTRACTOR

By: _Matthew Yost_____

_Matthew Yost_____
Printed Name / Title

_July 1, 2021_____
Date

CV-2022-07-2227          BAKER ROSS, SUSAN          07/01/2022 12:36:07 PM          CMCO          Page 23 of 25

### *American Security & Audio Video Systems, Inc.*
10000 Aurora Hudson Road, Hudson, OH 44236 (330) 468-3366

## SUBCONTRACTOR AGREEMENT

THIS AGREEMENT made and entered into this 30th day of June 2021 by and between **American Security & Audio Video Systems, Inc.** (hereafter called "**COMPANY**"), whose address is 10000 Aurora Hudson Road, Hudson, OH 44236 and and (Company) **Prep TMT, LLC**, License# LC 001709938 (hereinafter called "**SUBCONTACTOR**"), whose address is 3010 N. Highway 94, Unit E, Saint Charles, MO, 63301 and telephone is (636) 493-0514, with regard to the following facts:

A.    WHEREAS, the COMPANY is engaged in the business of manufacturing, fabricating, merchandising, selling, distributing, installing, servicing, repairing and monitoring electronic systems, including, BUT NOT LIMITED TO: burglary, fire and intrusion protective and detection systems and devices, emergency notification systems, closed circuit and television systems, communication systems, central cleaning systems, access systems, sound systems, stereo system, home theater systems; for residential, commercial, industrial and government applications presently in Ohio and expanding into other territories.

B.    SUBCONTRACTOR is in the business of installing pre-designed electronic systems, including burglar and fire alarm systems, access control systems, and closed circuit television systems.

C.    The parties desire that SUBCONTRACTOR perform services for COMPANY as an independent contractor pursuant to the terms and conditions of this Agreement.

IT IS HEREBY AGREED AS FOLLOWS:   *Note: Quote 1857 is for 9,262.50*

1.      SUBCONTRACTOR will furnish all of the labor, wire , cable supports and tools necessary to perform the work in accordance with the schedule set forth on the COMPANY work order, drawings and other documents provided by COMPANY to SUBCONTRACTOR.  SUBCONTRACTOR shall be compensated for said work in accordance with the terms and conditions herein at the rate of **$19,925.00 (Quote #1857 $9,962.50 and #1858 $9,962.50). $9,962.50 invoiced upon completion of pre-wire. $9,962.50 invoiced upon completion of installation.**
Additional labor requested **$85.00** per hour standard technical installation/service personnel, if services are performed on an hourly basis, or the labor quote provided by SUBCONTRACTOR on a per job basis, or other compensations as determined by the COMPANY.  If SUBCONTRACTOR performs hourly work for COMPANY, COMPANY at its sole discretion, shall verify both the accuracy of the amount of the hourly work being charged and the propriety and necessity of the work undertaken on an hourly basis.

2.      SUBCONTRACTOR shall pay all costs in connection with the labor and materials incurred by it in the installation of each system.  In the event SUBCONTRACTOR fails to make any payment, to its laborer and/or material providers, COMPANY, at its sole discretion, may make such payments on behalf of the SUBCONTRACTOR and shall deduct the said amount from the funds due to the SUBCONTRACTOR.  SUBCONTRACTOR shall in no way charge to or obligate COMPANY for any tools, materials or services.

3.      SUBCONTRACTOR shall install each installation in a good and workmanlike manner, and shall adhere to the standards and specifications required by COMPANY.  COMPANY shall have the right to inspect each installation and, if such installation is not satisfactory, require the SUBCONTRACTOR to make any changes or additions deemed necessary by COMPANY, at its sole discretion.

4.      SUBCONTRACTOR shall be excused from any delay and completion of the work on any installation caused by acts of God, acts of COMPANY'S customer (hereinafter called "OWNER"), or the OWNER'S agents.  Should the OWNER assess damages for delay, whether liquidated damages or otherwise, against COMPANY, because of any delay caused by SUBCONTRACTOR or SUBCONTRACTOR'S laborers or suppliers, then SUBCONTRACTOR shall reimburse COMPANY in full upon written demand by COMPANY.  SUBCONTRACTOR shall commence work on any installation assigned to it by COMPANY as soon as possible, but no later than 3 days after written notification from COMPANY and will conduct the work continuously with reasonable diligence in strict accordance with COMPANY'S time schedule, and will conform with any change in the time schedule ordered by COMPANY, and cooperate in related work and in no manner will interfere with the work of COMPANY or other subcontractors.

5.      SUBCONTRACTOR shall comply with all terms and conditions of any collective bargaining agreement which COMPANY notifies SUBCONTRACTOR in writing is applicable to the work to be done under this Subcontract Agreement and prevent the

Confidential                                   Page 1

Initials: _____                                                              Sub Agree 1-21

**EXHIBIT B**



occurrence of any strikes, slow down or other labor difficulties or dispute arising out of the presence of SUBCONTRACTOR on the job or the activities of SUBCONTRACTOR.

6.       SUBCONTRACTOR will be solely responsible for any and all of its expenses, health and medical insurance and will maintain in full force and effect a Workman's Compensation insurance policy and comprehensive liability insurance policy and automobile liability policy each with a minimum limit of $1,000,000.00 or such other limit as specified by COMPANY in Appendix A for death or injury to any one person or injury or death to persons in any one accident and for damages to or destruction of property and the naming of COMPANY as an additional insured.  Such policy shall not be cancelable without thirty (30) days prior written notice to COMPANY.  SUBCONTRACTOR will furnish to COMPANY upon request a certificate of the insurance carrier showing current coverage and expiration dates.  SUBCONTRACTOR agrees to hold COMPANY harmless and indemnify COMPANY from and against any and all loss, cost, expense, damage, suits, causes of action, attorney's fees and any and all other costs or expenses arising out of the action or inaction (including active or passive negligence) of SUBCONTRACTOR, its agents or employees, including without limitation any charge to OWNER or OWNER'S property, and Company's actual attorney's fees for above and for COMPANY's enforcement of the terms and conditions of this Agreement.

7.       ·  It is hereby declared to be the express intention of each of the parties that the relationship created hereto between COMPANY and SUBCONTRACTOR by this Agreement is that of an independent contractor and SUBCONTRACTOR. SUBCONTRACTOR'S employees or agents shall not be deemed to be the employees or agents of COMPANY for any purpose. SUBCONTRACTOR shall have the sole right to hire and fire all of its employees or agents and shall exercise all control, direction and supervision over them with respect to the work to be performed hereunder, and the manner in which the work is to be performed, and COMPANY shall not have any right to exercise any control, direction or supervision over the said employees or agents of SUBCONTRACTOR, subject to the limitations set forth herein.  SUBCONTRACTOR or its agents agree not to divulge any information about COMPANY, its operations, customers, marketing policies, installation policies, monitoring or servicing policies.

8.       SUBCONTRACTOR agrees that it shall make and shall be responsible for all required deductions for payments to its employees or agents and shall make and render in its own name all reports and payments of such sums so deducted as shall be required by any and all Federal and State Unemployment Compensations Acts, Social Security Act and any and all other Federal and/or State laws relating to taxes on income and by all other Federal or State laws of whatsoever kind and character.

9.       SUBCONTRACTOR will comply with all laws, ordinances, rules, regulations, orders and requirements of any public body and any building inspector and will maintain its contractor's license in effect as required in the State.  SUBCONTRACTOR shall bear the entire expense of complying with all of the requirements of this paragraph and shall receive no extra or additional compensation thereof.

10.      This Agreement may be terminated by COMPANY at any time upon the giving of written notice to the SUBCONTRACTOR.  If COMPANY shall terminate this Agreement SUBCONTRACTOR shall cease work immediately on any installations in progress, and shall return to COMPANY all equipment supplies, and all other property of COMPANY in the possession of SUBCONTRACTOR and shall return to COMPANY all paperwork, work orders and other documents relating to COMPANY'S installation(s).  Upon the failure of the SUBCONTRACTOR to return all such property immediately upon termination of this Agreement, SUBCONTRACTOR irrevocably consents to and authorizes COMPANY to apply any and all funds under its control and payable to SUBCONTRACTOR to the costs, replacement or recovery of said property.  Nothing contained in this provision shall be construed to limit COMPANY's rights to seek additional relief.  Upon termination of this Agreement by COMPANY, COMPANY shall compensate SUBCONTRACTOR for work completed by SUBCONTRACTOR prior to termination of this Agreement based upon the percentage completion of the installation; provided, no payment shall be made to SUBCONTRACTOR until the work performed by SUBCONTRACTOR has been approved by COMPANY, and any payments made to SUBCONTRACTOR shall be subject to offset by COMPANY for any losses sustained by COMPANY as provided for in this Agreement, including any expenses incurred by COMPANY in having work performed by SUBCONTRACTOR reinstalled, restored, and/or corrected.

11.      As an inducement for COMPANY to enter into this Agreement with SUBCONTRACTOR, and as part of the consideration for entry into it, SUBCONTRACTOR agrees that upon the termination of this Agreement neither he nor his employee's, agents, or officers will induce or endeavor to induce, directly or indirectly, an employee or other agent of COMPANY to leave such employment or agency, or will in any way contact, solicit or attempt to sell similar products or services of the COMPANY to any of the COMPANY's customers and/or subscribers regardless of the customer/subscriber's geographical location for a period of thirty six (36) months from the date of termination of this Agreement, either for his own benefit or the benefit of any other person, firm, partnership or corporation.  SUBCONTRACTOR will in no way represent that he is an employee of COMPANY nor shall he use the name of COMPANY or any names which may be associated with or confused with COMPANY.

Confidential                                                   Page 2

Initials:  _JR_                                                                                         Sub Agree 1-21

12.      In the event the OWNER contends that the work of the SUBCONTRACTOR was defective or caused delays, or is unsatisfactory in some other way, and if as a result of the same OWNER fails to pay any amount which would have otherwise been due COMPANY, the amount of any losses sustained by COMPANY as a result shall be deducted from the payments to be made to SUBCONTRACTOR hereunder unless said claim asserted by OWNER was caused by COMPANY.

13.      SUBCONTRACTOR agrees to guarantee his work to COMPANY against all defects in workmanship and materials supplied by SUBCONTRACTOR for a period of ninety (90) days from the date of completion unless otherwise stated in Appendix or other documents provided by COMPANY relative to this Agreement.

14.      Each paragraph and provision of this Agreement is severable from the Agreement and if one provision or part thereof is declared invalid, the remaining provisions shall nevertheless remain in full force and effect. It is expressly agreed that this Agreement embodies the entire agreement of the parties in relation to the subject matter hereof and that no other agreement or understanding, verbal or otherwise, relative to the subject matter hereof exists between the parties at the time of execution hereof. This Agreement shall be construed in accordance with the laws of the State of Ohio. All appendices and attachments to this Agreement are incorporated by reference herein and made a part hereof. The waiver by either party of any condition, requirement or provision of this Agreement shall not be construed to be a subsequent or continuing waiver of such condition, requirement or provision. Terms and references to any gender refer to all genders.

IN WITNESS WHEREOF, the parties hereafter have executed this Agreement on the date first above written.

COMPANY                                                    SUBCONTRACTOR

By: _____              By: _____
        Frank Baxter-President                              _____
                                                               Thomas Reed / member
                                                              Printed Name / Title

_____7/16/2021_____                           _____7/16/2021_____
Date                                                      Date

CV-2022-07-2227          BAKER ROSS, SUSAN          07/01/2022 12:36:07 PM          INST          *Page 1 of 1*



**Summit County Court of Common Pleas**
**Civil Division**

Print Form

Reset Form

**Instructions:** Complete the following form and file with the Summit County Clerk of Courts - Civil Divsion, located at: 205 South High Street, 1st Floor, Akron, Ohio 44308.

| Case Caption: | |
|---|---|

American Security & Audio Video Systems, Inc., and Frank Baxter

    Plaintiff

                      v.             Case Number  _____

Prep TMT, LLC, d/b/a Prep Security, Thomas Reed, and Matthew Prost

    Defendant                          **INSTRUCTIONS FOR SERVICE**

**To Clerk**: You are hereby requested to make service upon the following by:

- [ ] FedEx
- [X] Certified Mail
- [ ] Regular Mail
- [ ] Sheriff Service (Personal)
- [ ] Sheriff Service (Personal or Residential)
- [ ] Personal Service (Process Server): _____

**Please Serve the following pleadings:**

Plaintiffs' Complaint and all associated exhibits.

**Parties to be served:**

Name: Prep TMT, LLC

Address: 7701 Clayton Rd.

Address: _____

City: St. Louis    State MO   Zip 63117

Name: Thomas Reed

Address: 7701 Clayton Rd.

Address: _____

City: St. Louis    State MO   Zip 631117

Name: Matthew Prost

Address: 7701 Clayton Rd.

Address: _____

City: St. Louis    State MO   Zip 63117

Name: _____

Address: _____

Address: _____

City: _____    State ___   Zip _____

s/  _____          0078160

                                    Supreme Ct #

by: Christopher B. Congeni
     Attorney for Plaintiffs
     ASAV and Frank Baxter

CV Form 014

*Sandra Kurt, Summit County Clerk of Courts*

## IN THE COURT OF COMMON PLEAS, SUMMIT COUNTY, OHIO

CASE NUMBER:   CV-2022-07-2227

AMERICAN SECURITY & AUDIO VIDEO SYSTEMS
10000 Aurora Hudson Rd.
Hudson, OH, 44236

-VS-                                                                    **SUMMONS**

PREP TMT, LLC
7701 Clayton Rd.
St. Louis,  MO  63117

**TO the following:**

MATTHEW PROST
7701 Clayton Rd.
St. Louis, MO  63117

You have been named as a defendant(s) in a complaint filed in the Summit County Court of Common Pleas, Summit County Courthouse, 205 S. High St., Akron, Ohio, 44308.

A copy of the COMPLAINT is attached hereto.   The name and address of the Plaintiff's attorney is:

CHRISTOPHER BLAISE CONGENI
1111 Superior Ave
Ste 1355
Cleveland, OH   44114

**You are hereby summoned and required to serve upon the attorney listed above, or upon the party if they have no attorney of record, a copy of an answer to the COMPLAINT within twenty-eight (28) days after service of this summon on you, exclusive of the day of service.   Your answer must be filed with the Court within three days after the service of a copy of the answer on the attorney, or upon the party, if there is no attorney of record.**

**If you fail to appear and defend, judgment may be rendered against you for the relief demanded in the COMPLAINT.**

Sandra Kurt
Summit County Clerk of Courts

July 1, 2022

## IN THE COURT OF COMMON PLEAS, SUMMIT COUNTY, OHIO

CASE NUMBER:   CV-2022-07-2227

AMERICAN SECURITY & AUDIO VIDEO SYSTEMS
10000 Aurora Hudson Rd.
Hudson, OH, 44236

-VS-                                                                              **SUMMONS**

PREP TMT, LLC
7701 Clayton Rd.
St. Louis,   MO   63117

**TO the following:**

PREP TMT, LLC
7701 Clayton Rd.
St. Louis, MO   63117

You have been named as a defendant(s) in a complaint filed in the Summit County Court of Common Pleas, Summit County Courthouse, 205 S. High St., Akron, Ohio, 44308.

A copy of the COMPLAINT is attached hereto.   The name and address of the Plaintiff's attorney is:

CHRISTOPHER BLAISE CONGENI
1111 Superior Ave
Ste 1355
Cleveland, OH   44114

**You are hereby summoned and required to serve upon the attorney listed above, or upon the party if they have no attorney of record, a copy of an answer to the COMPLAINT within twenty-eight (28) days after service of this summon on you, exclusive of the day of service.   Your answer must be filed with the Court within three days after the service of a copy of the answer on the attorney, or upon the party, if there is no attorney of record.**

**If you fail to appear and defend, judgment may be rendered against you for the relief demanded in the COMPLAINT.**

Sandra Kurt
Summit County Clerk of Courts

July 1, 2022

## IN THE COURT OF COMMON PLEAS, SUMMIT COUNTY, OHIO

CASE NUMBER:   CV-2022-07-2227

AMERICAN SECURITY & AUDIO VIDEO SYSTEMS
10000 Aurora Hudson Rd.
Hudson, OH, 44236

-VS-                                                                          **SUMMONS**

PREP TMT, LLC
7701 Clayton Rd.
St. Louis,   MO   63117

**TO the following:**

THOMAS REED
7701 Clayton Road
St. Louis, MO   63117

You have been named as a defendant(s) in a complaint filed in the Summit County Court of Common
Pleas, Summit County Courthouse, 205 S. High St., Akron, Ohio, 44308.

A copy of the COMPLAINT is attached hereto.   The name and address of the Plaintiff's attorney is:

CHRISTOPHER BLAISE CONGENI
1111 Superior Ave
Ste 1355
Cleveland, OH   44114

**You are hereby summoned and required to serve upon the attorney listed above, or upon the
party if they have no attorney of record, a copy of an answer to the COMPLAINT within
twenty-eight (28) days after service of this summon on you, exclusive of the day of service.   Your
answer must be filed with the Court within three days after the service of a copy of the answer on
the attorney, or upon the party, if there is no attorney of record.**

**If you fail to appear and defend, judgment may be rendered against you for the relief demanded in
the COMPLAINT.**

Sandra Kurt
Summit County Clerk of Courts

July 1, 2022



**UNITED STATES**
**POSTAL SERVICE.**

Date Produced: 07/18/2022

SUMMIT COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™/RRE item number 9214 8901 5774 4600 0001 3938 92. Our records indicate that this item was delivered on 07/12/2022 at 10:25 a.m. in SAINT LOUIS, MO 63117. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Customer Reference Number:        C3528819.20741282



**UNITED STATES**
**POSTAL SERVICE.**

Date Produced: 07/18/2022

SUMMIT COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™/RRE item number 9214 8901 5774 4600 0001 3938 85. Our records indicate that this item was delivered on 07/12/2022 at 10:25 a.m. in SAINT LOUIS, MO 63117. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance, please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal Service. It is solely for customer use.

Customer Reference Number:        C3528818.20741281

2


**UNITED STATES**
**POSTAL SERVICE.**

Date Produced: 07/18/2022

SUMMIT COUNTY CLERK OF COURTS:

The following is the delivery information for Certified Mail™/RRE item number 9214 8901 5774 4600
0001 3938 78. Our records indicate that this item was delivered on 07/12/2022 at 10:25 a.m. in SAINT
LOUIS, MO 63117. The scanned image of the recipient information is provided below.

Signature of Recipient :

Address of Recipient :

Thank you for selecting the Postal Service for your mailing needs.  If you require additional assistance,
please contact your local post office or Postal Service representative.

Sincerely,
United States Postal Service

The customer reference number shown below is not validated or endorsed by the United States Postal
Service. It is solely for customer use.

Customer Reference Number:        C3528817.20741280

2